## A99A0783. HUFF v. THE STATE.
### (519 SE2d 263)

POPE, Presiding Judge.

Victoria Xemobia Huff was tried and convicted of two counts of armed robbery. Here, in nine enumerations of error, she argues that the trial court erred in denying her motions for mistrial and for a new trial.

Viewing the evidence in the light most favorable to the verdict, on October 30, 1996, at about 9:00 p.m., Victoria Huff drove with her friend, Kimberly Prince, and a 12-year-old girl to a haunted house. When they arrived at the haunted house, Huff's passengers remained in the car as Huff pulled a gun from under the front seat and left the car.

At the same time that night, Laurie Kobs and Lisa Purcell were leaving the haunted house and walking back to their car when someone grabbed them from behind. Each woman felt arms go around her and heard a voice say: "hey ladies." The victims turned around and saw Huff, who was holding a revolver in their faces and demanding money. Huff first held Purcell at gunpoint and took $25 from her. Kobs did not have any money, so she handed Huff her driver's license and some receipts. Huff demanded Kobs' jewelry, so Kobs broke her necklace off and gave it to Huff. Huff then told Kobs she wanted her watch, to which Kobs said no. Kobs then ran away from Huff. Huff ran after Kobs and Purcell followed. The victims saw Huff get into a red Maxima and Purcell tried to memorize the tag number on the car. Huff drove away in the car and the victims immediately reported the

crime to Cobb County police officer Bullock, who was working at the haunted house. They told Bullock that Huff drove off in a red Nissan Maxima with Olympic tags 19ME2 and that two other passengers were in the car. They described the robber as a sixteen- to eighteen-year-old male, who was about five-three to five-four, and weighed about one hundred and thirty-five pounds. They reported that the robber was wearing a baseball cap with a dark bill and baggy clothes. At trial Kobs recalled that the robber had chubby cheeks and short hair. Both Kobs and Purcell mistakenly identified the robber as male.

Officer Bullock issued a lookout for a suspect matching the description that the victims had given him. Meanwhile officers less than two miles away from the haunted house saw a car with tags which matched the description Purcell had given. The officers conducted a routine felony traffic stop. When Huff got out of the car, she was wearing a hat and the officer who stopped her mistakenly thought that she was a man. In response to inquiry from the police officers regarding weapons, Huff admitted that she had a loaded gun under the seat. The officers performed a pat-down search of Huff and found $25 in her pocket.

Meanwhile, two detectives went to the haunted house and took another description of the robber from the victims. The victims again described a small young black male wearing a ball cap with a dark bill and dark, baggy clothing. They stated that the robber was carrying a shiny silver gun.

The officers at the haunted house then learned of the traffic stop of the red Maxima and brought the victims to the gas station for an identification showup. The officers stated that they decided the showup would be appropriate because of the closeness in time between the incident and the traffic stop. The victims arrived at the showup scene about 15 to 20 minutes after the robbery. Huff and her passenger, Prince, were seated in separate patrol cars and were handcuffed.

Purcell was asked to look at the women seated in the back of the patrol cars and identify either. She was unable to identify either woman. The officer conducting the showup then learned that Huff had been wearing a baseball cap during the crime, so he placed the baseball cap on Huff's head. Kobs was then brought to view the passenger from Huff's car. Kobs stated that Prince was not the robber. An officer then removed Huff from the patrol car. At this point, Kobs identified Huff as the robber, saying "that's him." Kobs testified that at the showup she was certain of Huff's identity. The officers arrested Huff.

Kobs testified that about ten days after the robbery she found her driver's license on the driveway of the haunted house.

The State introduced two photographs of the defendant on the

night of the robbery, which Kobs testified accurately depicted Huff on that evening. In addition to the two victims, five police officers identified Huff at trial as the person who was driving the red car on the night of the robbery. At trial, Kobs identified articles of clothing Huff was wearing on the night of the robbery as those of the robber's.

In talking with police officers on the night of the robbery, Huff claimed that she had driven to the haunted house to check the admission price. She admitted that she ran to her car from the haunted house, but stated that she was running because she heard people screaming. One officer testified that before Huff was told that a necklace had been taken from one of the victims, she explained that she was wearing her own necklace.

Huff testified at trial and insisted that she had not been involved in the robbery.

1. Huff claims that her motion to suppress was improperly denied and that evidence of Kobs' pretrial identification of her was improperly admitted. Huff contends that the identification procedure at the showup was impermissibly suggestive and that there was a substantial likelihood of misidentification.[1]

> There is no per se exclusionary rule applied to pre-indictment confrontations. Pre-indictment confrontations should be scrutinized to determine if they are unnecessarily suggestive and conducive to irreparable mistaken identification. The totality of the circumstances must be viewed to determine if there is a likelihood of misidentification which offends against due process and the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, and the level of certainty demonstrated by the witness at the confrontation.

(Citations and punctuation omitted.) *Flores v. State*, 228 Ga. App. 152, 153 (491 SE2d 86) (1997).

In this case, assuming arguendo that the showup was impermissibly suggestive, see, e.g., *Towns v. State*, 136 Ga. App. 467, 468 (1) (221 SE2d 631) (1975), there was not a substantial likelihood of misidentification. See *Wright v. State*, 222 Ga. App. 613 (1) (475 SE2d 670) (1996); compare *State v. Frye*, 205 Ga. App. 508, 509-510 (2) (422 SE2d 915) (1992); *Arnold v. State*, 155 Ga. App. 569 (1) (271 SE2d

---

[1] Although Huff refers to the pretrial identification at the bond hearing, this point was never clearly raised in her motion to suppress and is waived here.

702) (1980). Using the factors above, the evidence established that Huff initially approached Kobs from behind, but that then Kobs turned to face Huff. Kobs stated that Huff was "not even two feet" away and that "[s]he was right in front of me." Though it was dark outside, lights from the interstate partially illuminated the area. Kobs estimated that she looked at Huff's face for about ten seconds. Kobs gave consistent descriptions of Huff both at the scene and when she was questioned a short while later. Although Kobs mistakenly thought that Huff was a man, her description was otherwise accurate. Kobs was certain that Huff was the robber when she identified Huff at the showup; she was certain of Huff's identity at the bond hearing a week later; and she was certain of Huff's identity when she identified her at trial.

Moreover, even assuming that the court erred in admitting testimony regarding the pre-trial identification, in light of the overwhelming evidence of Huff's guilt, we conclude that any such error was harmless beyond a reasonable doubt. *Wright v. State*, 210 Ga. App. 616, 617 (2) (436 SE2d 783) (1993); *McGee v. State*, 209 Ga. App. 261, 262 (1) (433 SE2d 374) (1993).

2. In a separate enumeration, Huff claims that the victims' in-court identifications of her were improperly admitted. Specifically, she argues that the in-court identifications were constitutionally tainted by the prior pre-trial identifications and should have been excluded.

"Even if the pretrial identification is tainted, the in-court identification is not constitutionally inadmissible if it does not depend upon the prior identification but has an independent origin." (Citation and punctuation omitted.) *State v. Frye*, 205 Ga. App. at 510. See also *Wright v. State*, 222 Ga. App. at 614 (1); *Davis v. State*, 216 Ga. App. 580, 582 (2) (455 SE2d 115) (1995).

For the reasons set forth in Division 1, we conclude that Kobs' in-court identification of Huff was admissible because it had an independent basis from the allegedly suggestive showup procedure.

There was no taint with regard to Purcell's in-court identification. She did not correctly identify Huff at the showup. Although she conceded that she identified Huff at the bond hearing, her testimony at trial established the basis for her identification. She testified that she saw Huff's face the night of the robbery and that Huff was no more than a foot away. Purcell estimated that she looked in Huff's face for approximately a minute. She stated that she was confused at the showup because Huff was not wearing a hat and that the two people in the police cars were obviously women. Purcell's description of Huff, like victim Kobs', was mostly accurate apart from the description of Huff as a male. Purcell testified at trial that she was certain of her identification.

3. In two enumerations of error, Huff claims that the court erroneously denied her motion for mistrial based on juror misconduct. Huff argues that the jurors' behavior deprived her of a fair and impartial jury. Huff's arguments are based on a conversation which a deputy sheriff reported occurred between three jurors, despite the court's instruction to the jurors to refrain from discussing the case among themselves.

According to the deputy, during the recess after the State's first witness (victim Kobs) testified, three female jurors discussed the witnesses' demeanor. The deputy testified that the jurors also discussed Huff's demeanor during the trial and stated that she "was rolling her eyes, gesturing as if she did not care about what was going on." The deputy stated that the jurors also "made comments about people in the gallery laughing and making head gestures."

The court sua sponte individually questioned the jurors and asked them the substance of any conversation regarding the case and whether they could remain impartial. The jurors' recollection of the conversation was basically consistent with the deputy's account. One juror stated that "[i]t was a very general conversation. Just talk, trying to put ourselves in the place of how someone feels when they have to sit, you know, with someone questioning you." All of the jurors interviewed stated that they could remain impartial and that the conversation did not influence their final decisions in the case.

> There is a presumption of prejudice to the defendant when an irregularity in the conduct of a juror is shown and the burden is on the prosecution to prove beyond a reasonable doubt that no harm has occurred. However, a jury verdict will not be upset solely because of such conduct, unless the statements are so prejudicial that the verdict must be deemed inherently lacking in due process. Our inquiry then must be directed to whether this error is so inherently prejudicial as to require a new trial, or whether it is an immaterial irregularity without opportunity for injury. Where the substance of the communication is established without contradiction, the facts themselves may establish the lack of prejudice or harm to the defendant.

(Citations and punctuation omitted.) *Sims v. State*, 266 Ga. 417, 419 (3) (467 SE2d 574) (1996).

Here, the jurors' statements to each other did not involve extrajudicial information, nor did they demonstrate that the jurors were deliberating before the close of evidence, nor did they indicate that one juror was attempting to persuade another on any issue or testimony. See *Sims v. State*, 266 Ga. at 420 (3). Accordingly, we conclude

that the error was not so prejudicial as to have contributed to the conviction and the jurors' actions were harmless beyond a reasonable doubt. See *Holcomb v. State*, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997); *Davidson v. State*, 231 Ga. App. 605, 612-613 (7) (499 SE2d 697) (1998); see generally *Chadwick v. State*, 164 Ga. App. 102 (2) (296 SE2d 398) (1982).

Huff also claims that the court erred in individually questioning jurors about their misconduct based on the guidelines used in *United States v. Herring*, 568 F2d 1099 (5th Cir. 1978). Huff contends that questioning the jurors individually was harmful and prejudicial. We reject this argument. The court's inquiry into the misconduct was "an acceptable means of proof to meet the burden cast upon the state, in such circumstances, to rebut by proof a presumption of harm." (Citations omitted.) *Hardy v. State*, 242 Ga. 702, 704 (3) (251 SE2d 289) (1978). In *United States v. Herring*, the court concluded that the district court should have examined the jurors and found out (1) how much contact the jury members had had with the damaging publicity; and (2) how much prejudice to the defendant, if any, resulted from that contact. Id. at 1106. Although the context of *Herring* was different from the instant case, the avenues of inquiry addressed in that case pertained here. There was no error. See generally *McGuire v. State*, 200 Ga. App. 509, 510 (3) (408 SE2d 506) (1991) (discusses court's discretion in striking juror).

4. Huff, who is African-American, argues that the array of jurors available in the jury pool violated her constitutional right to a jury chosen from a fair cross-section of her community. The record reflects that the prospective jurors were brought into the courtroom. The court asked some general questions of the panel. Then, although not recorded, counsel conducted voir dire. The following day, defense counsel raised the challenge regarding the array.

Huff should have "challenged the array when it was first put upon [her]. Georgia statutes and case law indicate that a jury is 'put upon' a defendant at the time that the jury array is seated and voir dire commences." (Citations and punctuation omitted.) *Pugh v. State*, 214 Ga. App. 470, 471 (2) (448 SE2d 16) (1994). Instead, Huff waited until after voir dire was completed before challenging the array. There is no indication in the record before us that Huff did not have an opportunity to present the challenge in a timely manner. Accordingly, her challenge to the jury was untimely. See generally *Guest v. State*, 186 Ga. App. 318 (1) (367 SE2d 105) (1988). Moreover, although the court allowed Huff to present evidence, she failed to show that there was any flaw in the method used to create the traverse jury venire. See *Jewell v. State*, 261 Ga. 861, 863 (3) (413 SE2d 201) (1992).

5. Huff argues that the court erroneously denied her motion for

mistrial because character evidence was improperly admitted. Specifically, she objects to portions of her taped statement which contained references to "trouble" she had been in. The court held a motions hearing two months before the trial and determined that certain portions of the tape would be excised before it was played for the jury. Nevertheless, at trial the court instructed Huff's attorney to "start screaming" if anything objectionable arose in the tape. Huff did not object when the portions of the tape were played and has waived this argument. The failure to grant a mistrial was not error. See generally *Young v. State*, 217 Ga. App. 575 (1) (458 SE2d 391) (1995).

Huff's arguments regarding the questions about carrying a loaded pistol in her car also lack merit.

6. Huff argues that the court erred in its jury charges by failing to give her requested charges on identification evidence and on the lesser-included offense of robbery by intimidation. With respect to the charge on identification testimony, the court's charge accurately and fully stated the applicable principles and there was no error in its failure to use the charge Huff requested. *Jones v. State*, 225 Ga. App. 673, 676 (3) (484 SE2d 702) (1997); *Rowell v. State*, 176 Ga. App. 309, 310 (3) (335 SE2d 689) (1985).

With respect to the second argument, Huff argues that there was a controversy regarding whether a gun was used to commit the crime and therefore the jury should have been charged on the lesser included offense of robbery by intimidation. We reject this argument. "[W]here the state's evidence establishes all of the elements of an offense *and there is no evidence raising the lesser offense*, there is no error in failing to give a charge on the lesser offense." (Citations and punctuation omitted; emphasis in original.) *Wynn v. State*, 228 Ga. App. 124, 126 (2) (491 SE2d 149) (1997). Here, the evidence did not support a charge on robbery by intimidation. The jury was authorized to find either that Huff committed the completed offense of armed robbery, or that she was not involved in the robbery at all.

7. Huff contends that the evidence was insufficient to support the verdict. We find that a rational trier of fact could find from the evidence adduced at trial proof of Huff's guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. Smith and Eldridge, JJ., concur.*

DECIDED JUNE 9, 1999 —
RECONSIDERATION DENIED JULY 13, 1999.

*Amelia G. Pray*, for appellant.

*Patrick H. Head, District Attorney, Debra H. Bernes, Michael S. Moody, Assistant District Attorneys*, for appellee.