## A99A2490. ARNOLD v. THE STATE.
(532 SE2d 458)

RUFFIN, Judge.

A Douglas County jury found appellant Willie Joseph Arnold guilty of two counts of armed robbery and one count of aggravated assault. Appellant challenges the sufficiency of the evidence and contends that the trial court should have granted a mistrial due to juror misconduct. Finding no error, we affirm.

1. The standard of review for a challenge to the sufficiency of the evidence is well established:

> [W]e view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We address only the sufficiency of the evidence, and we do not weigh the evidence or determine the credibility of the witnesses. As long as there is some evidence, even though contradicted, to support each necessary element of the State's case, the jury's verdict will be upheld.[1]

Viewed in this light, the evidence at trial showed that, in the early morning hours of December 17, 1994, armed men entered the home of Bernard Harper to rob the occupants. Harper had four guests in his home at the time: John Lindley, Rudolph Spence, Taylor Cook, and Mike Lindley. Harper and John Lindley were watching television in the living room while Spence, Cook, and Mike Lindley played craps in the kitchen. Harper, who is legally blind, testified that he heard a knock at the front door and said, "[c]ome in." The door opened, and a man walked into the living room and said, "This is a robbery, get down on the floor." Harper told the robber that he could not comply because he had recently been in an accident. The man walked past Harper toward the kitchen, where he "made all those guys get down on the floor," then he returned to the front door where a second man, who had a rifle, came in. The two men then searched Harper and his guests for money. Harper handed one of the men $5 from his sock. The man with the handgun, apparently irritated that no one had any money, said he was "going to make an example out of somebody." Shortly thereafter, Harper heard gunshots coming from the kitchen. According to Harper, the man with the rifle stayed at the front door the whole time while the man with the handgun went through the house. After the shots were fired, both men left the house through the front door.

John Lindley, who was in the living room with Harper, testified

---

[1] *Kellibrew v. State*, 239 Ga. App. 783 (1) (521 SE2d 921) (1999).

that he lay down on the floor as the men directed. Lindley described the first man who entered the house as about 5′ 7″ and wearing dark coveralls and a ski mask, but Lindley did not see the man with the rifle. Lindley soon noticed that the men were not watching him, so he crawled out of the living room into the adjoining kitchen and warned Spence, Cook, and Mike Lindley that a robbery was in progress. John Lindley then left through the back door and ran to the home of a neighbor, who called the police. While at the neighbor's house, he heard two shots ring out from the back of Harper's house.

  Spence testified that he heard John Lindley's warning about the robbery but paid no attention. After John Lindley passed through the kitchen, Spence went out onto the patio to smoke. As he lit his cigarette, a short man wearing a dark ski mask pressed the barrel of a gun against his neck and told him to go back inside the kitchen and lie down on the floor. Spence and the man walked into the kitchen, and Spence got on the floor next to Cook and Mike Lindley, who were already lying down. Spence heard a second man back in the bedroom "tearing drawers open . . . and stuff like that," but he never saw that man. The man in the kitchen asked Spence, Cook, and Mike Lindley for money, but they told him that they had none. The man said, "I'm going to make an example out of somebody if nobody don't come up with some money," then he hit Spence in the back of the head with the gun. Spence heard the second robber say that one of the victims had left the house, after which "they got kind of panicked" and started "moving around a little faster." As the man in the kitchen was leaving, he shot Spence in the leg.

  Cook testified that he was standing in the kitchen playing craps when he looked toward the front door and saw a man with a rifle standing there. The man was tall and wore a tan jacket with a white collar and a ski mask. Cook turned to run out the back door but saw another man come in the back door. This man, who had a pistol and wore a black ski mask and blue jumpsuit, yelled at Spence, Cook, and Mike Lindley to lie down on the floor, then demanded their money. The man reached into Cook's pocket and removed his wallet, which had no money. Cook heard the man talking with a third robber in the back of the kitchen. The man in the blue jumpsuit then said, "If we don't find the money, we going to have to make a believer out of . . . somebody." Cook then heard two shots fired in the kitchen.

  Mike Lindley testified that while he was in the kitchen playing craps, he saw a man with a handgun enter the kitchen from the back door. The man was approximately 5′ 8″ or 9″ and wore blue jeans, a denim jacket, a white hood, and a dark face mask. The man said "get down and nobody move," and Mike Lindley complied. The man reached into Mike Lindley's pocket and removed $2. As he was lying on the kitchen floor, Mike Lindley heard a knock at the front door

and saw the door open and "the AK-7 [sic] come in," but he could not see who had the gun. The man in the kitchen then fired two shots, one of which hit Mike Lindley in the leg.

Police arrived minutes after the robbers left the house. Shortly thereafter, Tracy Allen and Timothy Arnold[2] were arrested while walking down a street close to Harper's house. Allen was wearing blue coveralls, and Arnold was wearing blue pants, a jean jacket, and a hooded sweatshirt. On the ground nearby, police found a handgun, a loaded clip for the handgun, a loaded automatic rifle, and a black ski mask. Allen claimed that he had been only a lookout during the crime and that appellant had also participated in the robbery. Two days later, appellant was arrested, and all three men were charged with (1) armed robbery of Harper, (2) armed robbery of Mike Lindley, and (3) aggravated assault of Cook. Allen also was charged with aggravated assault by shooting Spence and Mike Lindley. The men were tried separately. Allen was convicted on all counts, and Arnold was acquitted.

Both Allen and Arnold testified at appellant's trial. Arnold testified that on the night of the robbery, he, Allen, and appellant parked appellant's car at some apartments near Harper's house, then sat in the car and drank beer. Appellant had gone to Harper's house earlier that night to buy marijuana, and Arnold had accompanied him but had not gone inside.[3] According to Arnold, appellant suggested robbing Harper. Appellant, Allen, and Arnold began walking through the woods toward Harper's house, but Arnold stopped before they reached the house and refused to continue. Arnold waited outside until he saw John Lindley run out the back door, then Arnold fled toward appellant's car. Allen caught up with him, and then the two were arrested. Arnold said he did not see appellant again that night.

Allen, on the other hand, testified that it was Arnold's, rather than appellant's, idea to rob Harper and that appellant did not participate. According to Allen, appellant gave him and Arnold a ride to the apartments near Harper's house, then Allen and Arnold walked to Harper's to commit the robbery. Allen went in the front door with the rifle, while Arnold went in the back door with the handgun. Allen admitted that his trial testimony flatly contradicted his previous testimony at Arnold's trial and his statements to police, in which he said that appellant had masterminded the robbery and had stood at Harper's front door with the rifle. Allen acknowledged telling police that appellant had said, "[w]e're going to go up there and armed rob

---

[2] Timothy Arnold is appellant's cousin and has the same last name. For clarity, we will refer to him as "Arnold" and to appellant as "appellant."

[3] Harper likewise testified that appellant had visited his house earlier on the night of the robbery.

some young dope punks." At appellant's trial, however, Allen claimed that his previous statements were lies.

Detective James Miller of the Douglasville Police Department testified that he spoke with appellant two days after the robbery. At first, appellant said that he had seen Allen and Arnold near Harper's house on the evening of the robbery but could not remember if they had been in his car. Appellant later changed his story and said that he had dropped Allen and Arnold off near Harper's house that night. Appellant said that Arnold was wearing a black skull cap, but appellant did not see any guns. Appellant also admitted that he had been to Harper's house earlier that evening to buy marijuana.

Although appellant contends that there was insufficient evidence linking him to the robbery, we find that ample evidence tied him to the crimes. Most significantly, Arnold testified that the robbery was appellant's idea and that appellant went to Harper's house with a rifle. Appellant contends that Arnold's testimony cannot be credited because it is the uncorroborated testimony of an accomplice. We disagree. Pretermitting whether Allen's acquittal precludes him from being an accomplice, there was sufficient evidence to corroborate his testimony. We have held that,

> although OCGA § 24-4-8 prevents the conviction of a defendant in felony cases where the only witness testimony is the uncorroborated testimony of an accomplice, slight evidence of a defendant's identity and participation from an extraneous source is all that is required to corroborate the accomplice's testimony, and thus, support the verdict. The necessary corroboration may be by circumstantial evidence. Moreover, an accomplice's testimony may be corroborated by the testimony of another accomplice.[4]

Here, Allen's out-of-court statements corroborate Arnold's testimony. Although at trial Allen claimed that appellant did not participate in the robbery, he previously told police — and he testified at Arnold's trial — that appellant masterminded the robbery and stood at Harper's front door with the rifle. These prior inconsistent statements, which constitute substantive evidence, are sufficient to corroborate Arnold's testimony.[5]

In addition to Arnold's testimony, appellant admitted to facts consistent with his participation in the robbery. He told police that he

---

[4] (Citation and punctuation omitted.) *Leigh v. State*, 223 Ga. App. 726, 729 (2) (478 SE2d 905) (1996).

[5] See *Woods v. State*, 209 Ga. App. 604, 605-606 (1) (434 SE2d 146) (1993); *Smith v. State*, 222 Ga. App. 366, 367 (2) (474 SE2d 272) (1996).

visited Harper's house earlier that night to buy marijuana, thus putting him in a position to develop the idea for the robbery. He also admitted that he drove Allen and Arnold to a spot within walking distance of the crime scene and that Arnold was wearing a black face mask. Moreover, appellant changed his story while talking to Detective Miller, thereby casting doubt on his credibility.

Finally, the testimony of the victims supports appellant's conviction. According to the victims, at least two men entered the house, one with a handgun and one with a rifle. Cook, the only victim able to describe the man with the rifle, testified that he was tall and wore a face mask and a tan jacket with a white sheepskin-type collar. This description does not fit Allen, who is 5′ 6″ and wore blue coveralls when he was arrested minutes after the robbery. Nor does it fit Arnold, who wore light jogging pants, a black jacket, and a hooded sweatshirt at the time of his arrest. Thus, the jury could have concluded that a third person wielded the rifle at Harper's front door and that the third person must have been appellant. In sum, the evidence was ample to support appellant's conviction.

2. Appellant also contends that the trial court should have granted a mistrial based on juror misconduct. Before the close of evidence, appellant overheard some jurors discussing the case during a break. His attorney requested a curative instruction, and the trial judge complied, reminding the jurors not to discuss the case until it was submitted to them. Defense counsel later moved for a mistrial, and appellant took the stand to relate what he had overheard. According to appellant, one juror said, "it was like three people in the house. . . . I'm still puzzled about the guy at the front door"; another juror asked, "how could Tracy catch up with Tim when Tim's supposed to have shot him and ran out the back"; a third juror said, "Jo-Jo was at the front door and Tim was back there"; and a fourth juror said "they didn't believe nothing that Tracy had said anything [sic] anyway." Appellant also testified that he did not hear any juror say that he was guilty.

The judge then individually asked all jurors whether they had heard any other jurors discussing the case. The jurors admitted to hearing such discussions but said that they had not reached any conclusions about appellant's guilt or innocence and could listen to the evidence with an open mind. Based on these responses, the judge denied the motion for mistrial but further admonished the jury to keep an open mind and refrain from deliberating until all the evidence had been presented.

When an irregularity occurs in the conduct of the jury, "[t]here is a presumption of prejudice to the defendant[,] . . . and the burden is on the prosecution to prove beyond a reasonable doubt that no harm

has occurred."[6] We will not set aside a jury verdict based on such an irregularity, however, unless "the conduct was so prejudicial that the verdict is inherently lacking in due process."[7] Moreover, "[w]here the substance of the communication is established without contradiction, the facts themselves may establish the lack of prejudice or harm to the defendant."[8]

The conduct of the jurors in this case was clearly improper, but we cannot conclude that it was so prejudicial as to deny due process to appellant. Although the jurors prematurely discussed the testimony of the witnesses, no juror expressed an opinion that appellant was guilty,[9] and there was no evidence that any juror presented extrajudicial information to other jurors or tried to persuade other jurors as to any issue or testimony.[10] Defense counsel promptly brought the misconduct to the judge's attention, and the judge immediately gave a curative instruction. Shortly thereafter, the judge individually questioned the jurors, all of whom stated that they had not formed an opinion regarding appellant's guilt or innocence and could keep an open mind as to the evidence. The judge then further admonished the jury not to deliberate prematurely. Under these circumstances, we find that the juror misconduct "was not so prejudicial as to have contributed to the conviction."[11]

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 24, 2000.

*Victor A. Cuvo,* for appellant.
*David McDade, District Attorney, Jeffrey L. Ballew, Assistant District Attorney,* for appellee.

---

[6] (Punctuation omitted.) *Huff v. State,* 239 Ga. App. 83, 87 (3) (519 SE2d 263) (1999).
[7] (Punctuation omitted.) *Turtle v. State,* 271 Ga. 440, 445 (5) (520 SE2d 211) (1999).
[8] (Punctuation omitted.) *Huff,* supra.
[9] Compare *Mullins v. State,* 241 Ga. App. 553 (525 SE2d 770) (1999) (reversing conviction where, during a recess, one juror agreed with statement of acquaintance that "the defendants would not be [here] if they were not guilty").
[10] Compare *Bobo v. State,* 254 Ga. 146-148 (1) (327 SE2d 208) (1985) (reversing conviction where two jurors went to crime scene to determine whether lighting conditions were adequate — a key issue in the case — and reported their conclusions to other jurors).
[11] *Sims v. State,* 266 Ga. 417, 420 (3) (467 SE2d 574) (1996).