A02A2416. THOMPSON v. THE STATE.
(581 SE2d 596)

PHIPPS, Judge.

James C. Thompson appeals his convictions for trafficking in cocaine and possession of a firearm by a convicted felon. Thompson claims the trial court erred (1) in overruling his objection to the admission of the cocaine into evidence because the chain of custody was not established and (2) in allowing the jury to determine the weight and purity of the cocaine because the integrity of the evidence was compromised. Thompson also claims that the trial court erred in failing to remove a juror who was the subject of an alleged bribery attempt and in denying his motions for a mistrial, to set aside the

verdict, and for a new trial in light of the irregularities arising from the bribery attempt. Finally, Thompson claims the trial court erred in removing a juror who stood alone in voting for his acquittal. Finding no error, we affirm.

Viewed in the light most favorable to the verdict,[1] the evidence shows that officers of the Albany-Dougherty Drug Unit obtained a search warrant for Thompson and his residence. Shortly after seeing Thompson enter the residence carrying a cardboard box, police entered the residence and seized Thompson and the box as he fled. The box contained 21 crack cocaine "cookies" and sandwich bags containing powdered cocaine.

1. Thompson contends that the chain of custody for State's Exhibit 1, the alleged cocaine, was not established because the evidence was tainted. We disagree.

Thompson's box and its contents were photographed at the scene. Investigator Ken Faust recovered the box and placed its contents into individual bags, which he sealed with tape and marked with his initials. The seized material was returned to the drug unit offices and made available for viewing by the press. Faust then placed the bags in an evidence locker accessible only to himself and the evidence custodian Jackie Nelson.

Nelson transported the sealed bags to the Georgia Bureau of Investigation crime lab in Moultrie. Lab chemist Susan Strickland received a sealed package identified by Thompson's case number and containing bags holding 24 items of solid material. She removed a sample from each bag for analysis. All the samples were determined to be cocaine. Strickland then combined the contents of all the bags into one sample in order to perform a quantitative analysis. The cumulative sample weighed 425.32 grams and was 37 percent pure cocaine.

The material allegedly seized from Thompson was produced at trial in a bag containing a reddish-purple liquid. Faust testified that the sample shown to him in court did not look like the material he had seized at Thompson's residence, and that he had not seen a similar liquid in other drug samples. Strickland explained that the color from the red evidence tape that she used while heat sealing the evidence after testing had seeped into the cocaine, which, at the time she sealed it, had taken on the moist consistency of "cookie dough."

Thompson argues that the State failed to prove that the chain of custody was intact and uninterrupted, and that the State could not show that the evidence had not been tampered with because the State supplied no acceptable explanation for the liquid. "Where the

---

[1] *Barber v. State*, 235 Ga. App. 170 (509 SE2d 93) (1998).

State seeks to introduce evidence of a fungible nature, it need only show with reasonable certainty that the evidence is the same as that seized and that there has been no tampering or substitution."[2] The chain of custody evidence was sufficient for the trial court to conclude that the State had met its burden of showing with reasonable certainty that the material identified as Exhibit 1 was seized from Thompson. Thompson's claim that the presence of red liquid in the evidence bag shows tampering is speculation.[3] The State provided a plausible explanation for the red liquid. Furthermore, there was no showing that the evidence contained the red liquid when it was tested for the presence of cocaine. The presence of the red liquid does not preclude the admissibility of Exhibit 1, and the weight of the evidence is left to the jury.[4]

2. Thompson claims that "the trial court erred in allowing the jury to determine the weight and purity of the alleged cocaine" contained in Exhibit 1 because the evidence had been so compromised that no accurate weight and purity determination was possible. Again, we disagree.

Thompson was charged with possession of 400 grams or more of a mixture with a purity of ten percent or more of cocaine. He contends that he could not have been found to possess such a mixture because the compound which was tested by the GBI crime lab for purity was a substance created by the State by combining 24 separate pieces of evidence. Thompson refers us to *Hill v. State*.[5] There, a law enforcement officer seized a number of jars and pots from Hill's laboratory, took them back to his office to allow them to dry out, and then scraped the contents of the various containers into a bag. The mixture tested positive for an unknown quantity of methamphetamine and weighed 90.5 grams. We reversed Hill's trafficking conviction because the State could not show that Hill possessed a mixture containing 28 grams of methamphetamine, as charged. Because the mixture contained materials found in the lab where the defendant was in the process of creating the drug, it was possible that any portion of the combined mixture was created from a substance that, before mixing, contained no methamphetamine at all. Here, however, every sample was separately tested and found to contain cocaine before any mixing occurred, and a purity analysis of the combined substance was performed.

---

[2] (Citation and punctuation omitted.) *Mathis v. State*, 204 Ga. App. 244 (1) (418 SE2d 800) (1992).

[3] See id.

[4] *Marshall v. State*, 213 Ga. App. 186, 187 (2) (444 SE2d 130) (1994).

[5] 253 Ga. App. 658 (560 SE2d 88) (2002).

In *Pugh v. State*,[6] the State's expert testified that she removed a sample from each of 18 bags of cocaine seized from the defendant, combined them, and determined that the combined material was 59 percent pure cocaine. We concluded that the expert's opinion as to the purity of the mixture of cocaine was sufficient evidence to overcome the defendant's motion for a directed verdict. Similarly, the trial court here did not err in allowing the jury to consider Strickland's expert testimony as to the weight and purity of the cocaine seized from Thompson.[7] The weight to be given the expert's opinion is a question for the jury.[8]

3. Thompson claims the trial court erred in failing to remove and replace a juror who was the subject of an alleged bribery attempt. He also claims that, in light of the bribery attempt, the trial court erred in failing to grant his motions for mistrial, to set aside the verdict, and for a new trial. These claims are without merit.

On the morning of the second day of jury deliberations, the trial court received a note from the jury, signed by juror J. L. R., who stated that he had been contacted at his home and offered a bribe to vote not guilty on behalf of Thompson. The trial court questioned J. L. R., who testified that a woman had telephoned him at home the night before and told him that "there's some money involved" if he would change his vote to not guilty. He testified that the caller was aware of the jury's eleven-to-one split. The record does not reflect any request to remove J. L. R., and the trial court, after advising J. L. R. not to discuss the matter with other jurors, returned him to the jury room.

Thompson contends that the trial court erred in not removing the juror because he did not make the outside contact known to the court before revealing it to the other jurors. If Thompson felt himself to be prejudiced, however, it was incumbent on him to request the removal and replacement of the juror, and he cannot complain now that the trial court failed to take it upon itself to take this particular action.[9]

Thompson further contends that the jury as a whole was tainted by the communication because J. L. R. told the other jurors about the bribery attempt before disclosing it to the judge. Thompson argues, under authority of *Watkins v. State*,[10] that the discussion of any information in the jury room which may influence the outcome, other than

---

[6] 216 Ga. App. 253, 254 (1) (454 SE2d 538) (1995).
[7] See also *Williams v. State*, 199 Ga. App. 566, 569 (2) (405 SE2d 716) (1991).
[8] *Pugh*, supra.
[9] See generally *Underwood v. State*, 218 Ga. App. 530, 534 (3) (462 SE2d 434) (1995) (a trial judge's ruling or election will not be reversed for not going further than requested).
[10] 237 Ga. 678 (229 SE2d 465) (1976).

evidence presented, is grounds for a new trial. In *Watkins*, two jurors made an unauthorized visit to the crime scene and then presented their findings to the other jurors.[11] Although it is apparent that J. L. R. told the other members of the jury about the improper contact, the situation here is much different from that in *Watkins*. J. L. R. never sought to gather evidence regarding the crime.

We cannot conclude that the bribery attempt of a juror on behalf of the defense, even if the other jurors learn of it, is such a fundamental violation of a defendant's right to trial by a fair and impartial jury that the only available remedy is a mistrial. To find that a new trial was absolutely required under the circumstances here would encourage improper contact with jurors on behalf of defendants. We conclude that the trial court did not abuse its discretion in denying Thompson's motions for a mistrial, to set aside the verdict, and for a new trial. We note that, while curative instructions may have been appropriate, Thompson may not benefit from his failure to request such instructions.[12]

4. Thompson also complains of the trial court's instruction to the jury, which included a statement that they "consider this in toto with everything else you've heard to this point." He contends that "in toto" encompassed extraneous and prejudicial information concerning the bribery attempt. We conclude that Thompson is misreading the instruction. The instruction was part of an additional charge given to the jury in connection with a special interrogatory in which the jury was asked to find the amount of cocaine Thompson knowingly possessed. The phrase must be read in context with the previous sentence, in which the trial court asked the jury to "consider the evidence as a whole as well as the jury charge and instructions that I have given you during the case as a whole." We find no error.

5. Finally, Thompson claims the trial court erred in removing juror V. C. from the jury panel. We conclude that the trial court did not abuse its discretion in so doing.

The trial court in its order denying Thompson's motion for a new trial noted that a female alternate juror, T. H., was seen "walking stride for stride" with a young man, Artavious Williams, while the trial was ongoing. Williams was "obviously in support" of Thompson. The trial court took further note of Williams when during jury deliberations Williams remained stationed outside chambers. After inquiry to court officials, the trial court learned that Williams was a "recidivist drug felon." The trial court's law clerk also observed T. H. conversing with Williams after jury deliberations had begun.

---

[11] Id. at 684-685.
[12] See *Underwood*, supra.

Before the jury was to reconvene on its second day of delibera-
tion, the trial court saw T. H. and V. C. in private conversation. He
asked the bailiff to tell V. C. to go to the jury room and T. H. to go to
her separate waiting area. The bailiff advised the trial court that "he
subsequently discovered that [T. H.] had followed [V. C.] into the jury
room. He had to ask [T. H.] to leave."

Later that morning, the trial court received two notes from the
jury. One concerned the attempted bribery of juror J. L. R., as dis-
cussed above in Division 3. The other note, signed by eleven jurors,
disclosed that the jury was deadlocked with one juror holding out for
an acquittal and characterized the holdout juror as hostile and "bent
on a vendetta to thwart justice." The trial court then questioned the
foreperson of the jury in open court. After being instructed as to a
juror who does not participate in deliberations and a juror who has a
difference of opinion with respect to the evidence, the foreperson tes-
tified that the holdout juror, V. C., had talked, but would not discuss
the merits of the evidence. The trial court called V. C. to the stand.
V. C. disagreed with the characterization that she would not discuss
evidence with the other jurors.

The trial court then questioned alternate juror T. H., who admit-
ted that she was familiar with Thompson, despite having failed to
indicate during jury selection that she knew him. She also admitted
having contact with Williams during the trial, including having
lunch with him. After questioning V. C. and T. H., the trial court
removed the jurors and sent a second alternate juror in to deliberate.

In its ruling denying Thompson's motion for a new trial, the trial
court explained that:

> [t]he Court had testimony of an effort to bribe a juror, evi-
> dence that the alternate juror was talking to one of Mr.
> Thompson's supporters (a convicted felon) and had not dis-
> closed knowing the defendant during voir dire, and person-
> ally saw these two jurors huddled in private conversation
> during a break in deliberations. Weighing the testimony
> given by the two jurors and observing their demeanor, the
> Court simply did not believe their testimony. Given the
> totality of the circumstances, the Court exercised its discre-
> tion in removing these jurors.

Thompson contends that the trial court did not have legal cause
to remove juror V. C. because there was no evidence that V. C. was
incapacitated or otherwise legally unfit to remain on the jury.[13]
"Under OCGA § 15-12-172, the trial court has discretion to discharge

---

[13] See *Mason v. State*, 244 Ga. App. 247, 249 (1) (535 SE2d 497) (2000).

a juror and replace him or her with an alternate at any time, and we will not reverse as long as the court's exercise of discretion has a sound legal basis. [Cits.]"[14] Here, the trial court did not remove V. C. solely for failure to deliberate, but under "the totality of circumstances" suggesting that V. C. was connected to an ongoing attempt to subvert the jury.

Thompson further contends that there was no logical connection between V. C. and the attempt to bribe J. L. R. nor was there any showing of improper contact between V. C. and T. H. He maintains that the only evidence of the topic of conversation between V. C. and T. H. was T. H.'s testimony that they had discussed travel arrangements to and from trial. An innocent conversation with others is not a legal cause for a juror's removal.[15] However, T. H. had shown herself to be deceitful insofar as her knowledge of Thompson, and the trial court was under no obligation to believe her later testimony about the nature of her contact with V. C.

Thompson also relies on *Stokes v. State*[16] and *Mason v. State*[17] to show that the trial court should have declared a mistrial rather than replacing the holdout juror. But these cases are dissimilar to the one before us. In *Stokes*, the trial court replaced jurors without inquiring whether they were under any disability. In *Mason*, we found that a lone holdout juror should not have been replaced because there was no showing that the juror was dismissed for cause. V. C., on the other hand, was dismissed for cause.

The caller who tried to sway J. L. R. knew about his current vote, indicating a possible breach in the confidentiality of the jury deliberations. T. H., shown to be tainted by her familiarity with both Thompson and Williams, followed V. C. all the way into the jury room before the bailiff was able to interrupt their conversation. Subsequently, 11 members of the jury characterized V. C. as acting on a "vendetta." When the trial court questioned V. C. and T. H., he was able to observe their demeanor, and did not believe either one. It is possible that none of these events, had they occurred in isolation, would have authorized the trial court to remove V. C. from the jury panel. But the deliberative process of the jury was under attack and circumstances authorized the trial court to connect V. C. to that attack. Furthermore, the trial court's decision to dismiss V. C. was founded in large part upon his personal observations of events in and around the courtroom. We will not second-guess those observations,

---

[14] *Darden v. State*, 212 Ga. App. 345, 347 (4) (441 SE2d 816) (1994).

[15] *Huff v. State*, 239 Ga. App. 83, 87 (3) (519 SE2d 263) (1999); *Hardy v. State*, 242 Ga. 702, 704 (3) (251 SE2d 289) (1978).

[16] 204 Ga. App. 141 (1) (418 SE2d 419) (1992).

[17] Supra.

and we defer to the trial court's discretion in responding to these extraordinary circumstances.

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED MARCH 13, 2003 —

*Kenneth W. Musgrove*, for appellant.

*Kenneth B. Hodges III, District Attorney, Sadhana Pandey, Assistant District Attorney*, for appellee.