314 Ga. 214
FINAL COPY

S22A0069.  JONES v. THE STATE.
S22A0380.  McFARLAND v. THE STATE.

PETERSON, Justice.

Appellants Xzavaien Jones and Terrell McFarland were tried

jointly and convicted of murder and related offenses in connection

with the shooting death of Anthony Meredith.[1] Both men appeal and

---

[1] The crimes took place on March 26, 2016. On September 27, 2016, a Muscogee County grand jury jointly indicted Jones, McFarland, and Tekoa Young for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), and violating the Georgia Street Gang Terrorism and Prevention Act ("gang act") (Count 5). Jones was also indicted for one count of possession of a firearm during the commission of a felony (Count 4).

At a joint jury trial held from April 17 through May 3, 2017, Jones, McFarland, and Young were found guilty of all counts. Jones was sentenced to life imprisonment for malice murder, five consecutive years in prison for the firearm charge, and fifteen concurrent years in prison for the gang-act violation; the trial court merged the remaining counts into Jones's malice murder conviction. McFarland was sentenced to life imprisonment for malice murder and five consecutive years in prison for the gang-act violation; the trial court merged the remaining counts into McFarland's malice murder charge. Although the court purported to merge Jones's and McFarland's felony murder charges into their malice murder convictions, those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (5) (434 SE2d 479) (1993).

Jones and McFarland each timely filed a motion for new trial, which was amended, and, following a joint hearing on September 18, 2020, the trial court denied both motions. Both men timely filed a notice of appeal; the appeals were docketed to the term of this Court beginning in December 2021 and were submitted for a decision on the briefs.

Young was sentenced to life imprisonment for malice murder and a

raise numerous trial court errors, including the removal of a dissenting juror during deliberations. Although the record may well have supported findings authorizing the trial court to remove the juror, the findings that the trial court actually made and to which our review is limited were not sufficient to justify removal. Because the trial court abused its discretion in removing the juror, we reverse.[2]

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed that, at all relevant times, Jones and McFarland were members of the Crips gang along with Christopher

concurrent sentence of five years for the gang-act violation, and she attempted to appeal. But in January we vacated the trial court's order on her amended motion for new trial and remanded the case with direction that the trial court dismiss the motion, because her original motion was filed pro se before her trial counsel had been authorized to withdraw.

[2] Jones obtained new counsel after his motion for new trial was denied but before a notice of appeal was filed. On appeal, Jones requested that this Court remand his case to the trial court so that he could have the opportunity to "have conflict-free counsel review potential claims of ineffective assistance of counsel." While Jones did not have an opportunity to raise claims of ineffective assistance of his trial counsel prior to this appeal, and raising such claims now would normally entitle him to a remand, Jones failed to enumerate any specific claims of ineffective assistance. Accordingly, this Court denied the motion for remand. In his brief, Jones requests that the Court reconsider its ruling. But given our reversal of his convictions on other grounds, Jones's request is moot.

Twitty, who was in a relationship with Tekoa Young, Jones's sister. In November 2015, Twitty was shot and killed at his house. Young believed that Meredith was the culprit because he had been in a drug-related dispute with Twitty. After Twitty's death, Young called Shanna Douglas, who was Young's best friend and Meredith's girlfriend. During that phone call, Young told Douglas that "[Young] wasn't going to be the only one crying."

On the evening of March 26, 2016, Devon Wynn was at Peachtree Mall in Columbus. Wynn, who knew both Meredith and Jones, saw Meredith near the food court entrance to the mall. Meredith was talking to Jones, another man, and a woman. Wynn was walking toward the group to greet Meredith when he saw Jones shoot Meredith. A nearby witness heard a man, whom he later identified as Jones, yell "f**k n***er, f**k n***er" at Meredith, followed by multiple gunshots. The witness then heard Jones say, "Come on, let's go," and saw Jones and another man sprint to a parked car and drive off.

Officers obtained a surveillance video recording from the mall's

3

parking lot from the evening of March 26. Douglas identified Young and Jones in the surveillance video at trial. The video showed that Young drove into the parking lot, got out of her car and paced while talking on a cellphone. Shortly thereafter, Jones and another man arrived at the mall together and parked a few spots away. The group talked briefly and then approached Meredith. Jones shot Meredith multiple times. The group then ran back to their respective vehicles and drove away.

After the shooting, Young spoke to police officers. She arrived at the police station driving a car that matched the car that she was seen driving in the surveillance video of the murder. Young denied any involvement in the shooting, telling officers that, on the afternoon of March 26, she left work and drove straight to a strip mall to do some shopping. Surveillance video from the strip mall recorded after the shooting showed Young wearing the same clothes that she had on in the surveillance video from Peachtree Mall. Police officers also interviewed McFarland. He denied being at the mall on the day of the shooting. He did admit knowing Meredith,

4

being a member of the Crips gang, and knowing about the escalating dispute between Meredith and Twitty.

Cellphone data introduced at trial showed that the cellphones associated with Jones, McFarland, and Young were all in the area of Peachtree Mall at the time of the shooting. Young's phone placed three calls right after the shooting, two to McFarland and one to Jones. Young also sent McFarland a text message (which Young subsequently deleted) asking "y'all good?" Investigators found that Young had deleted other post-shooting texts from her phone. In one deleted text, Young admitted being at the mall, and in another, Jones sent Young the address of 6351 Birling Drive. After the shooting, McFarland's and Jones's phones traveled east and stopped in the area of 6351 Birling Drive. Meanwhile, Young's phone traveled approximately three miles away to a strip mall.

Meredith's autopsy revealed that he suffered ten gunshot wounds. The majority of the wounds were back to front, indicating that he was shot in the back several times. The medical examiner concluded that the manner of death was homicide caused by

5

multiple gunshot wounds. The State also called an expert in criminal gang activity who testified that, based on statements the defendants made to law enforcement officers, their tattoos, their association before and after the crime, and their social media posts, Jones and McFarland were associated with the Crips gang. He further opined that the shooting was consistent with a retaliatory act required by the rules of the gang that would also increase Jones's and McFarland's status within the gang's structure.

2. Jones and McFarland assert that the trial court abused its discretion when it removed the jury foreperson after deliberations had started. We agree.

(a) The record shows that the jury was sent out for deliberations at 5:00 p.m. on Wednesday, April 26, 2017. The jury voted for a foreperson (L. M.) and then requested to return in the morning to begin deliberating. The trial court agreed and dismissed the jury for the night. Deliberations began on April 27 at 9:05 a.m. The jury sent the court three notes at 10:46, 11:07, and 11:26 a.m., requesting to view certain video evidence. The court then informed

6

the jurors that it would break for lunch and return at 1:00 p.m. to review the evidence. After court resumed, but before the jury reviewed the video, the court received two more notes. Relevant to the claim at issue here was the second note, which the court labeled Jury Question 7. This note, which the record reflects was written by L. M., stated:

> What if someone feels like they're guilty but not enough hardcore evidence to prosecute[?]
> no gun — but gun charge
> no clothing
> no gunpowder
> no calls before
> no sufficient evidence about gang related
> flimsy witness — the eyewitness seem[s] to know more about the case than [he's] revealing
> it's a[ ]lot of loopholes.

The trial court called the jurors into the courtroom and allowed them to review the requested video evidence. They were then sent back to the jury room to deliberate, and the judge conferred with the parties regarding the proper response to Jury Question 7. Thereafter, the court called the jury back into the courtroom and gave the following instruction:

7

If you'll recall, yesterday I charged you with the law that applies to the case, and also supplied you with two copies of that law.[3] I will instruct you to continue to deliberate. If you have questions, refer to the law that I've charged you with, determine the law, apply the law to the facts and the facts to the law to reach your verdict.

The jury returned to the jury room to continue deliberations.

At 5:04 p.m., the court received Jury Question 8, which stated: "The jury cannot come to a unanimous decision at this time on any of the 13 charges listed in the indictment. What do we do next?" Then, at 5:07 p.m., the judge received Jury Question 9 that stated: "Question #7 was not from the entire jury. One person wrote it and it is the same person unwilling to deliberate on the charges."[4] The court instructed the jury to continue to deliberate. About 20 minutes later, the jury asked to be excused for the evening and return to deliberate in the morning. The court agreed and dismissed everyone

---

[3] The charges read to and sent back with the jury addressed, in relevant part, the State's burden of proof, guilt beyond a reasonable doubt, mere presence and mere association, direct and circumstantial evidence, credibility of witnesses, identity, party to a crime, deliberating with an open mind, consulting with other jurors, and deciding the case based on the evidence and not sympathy.

[4] The record shows that Jury Question 9 was not written by L. M.

8

for the night.

The jury resumed deliberating at 9:00 a.m. on April 28. At 10:31 a.m., L. M. sent the judge a note that stated, "we have taken a vote, more than once . . . and we cannot reach [a] unanimous vote on any of the 13 charges." Attached to the note was an incomplete tally of the guilty votes for the various charges for each defendant, which indicated that the jury was split on many of the charges. In response to this note, the trial court again instructed the jury to continue its deliberations. The trial court received another note at 11:20 a.m. from L. M. that was marked "Personal to Judge." It read:

> I'm not sure if I have a different understanding of the law or what. I honestly feel that they do have some evidence but not enough for me to say guilty. I'm not sure if I have a different concept of how things work or what[ ] my duty here is, I have been through the evidence[;] we have went over it. I'm not sure what y[']all want from me, only thing happening now is, I'm getting force[d] to follow what everyone else is saying. Can I be switch[ed] with [an] alternate so y[']all can get the answer you're looking for. I'm firm! This is from [L. M.] alone, writing this.

The trial court had extensive discussions with the parties regarding how it should proceed. During those discussions, McFarland, as well

9

as Young, moved for a mistrial. Without ruling on the motions, the trial court eventually decided to conduct an inquiry.

The trial court brought in the jury and asked L. M. for clarification on the tally. L. M. stated that "someone else took the tallies and did all that, I just signed [the note]." Still, L. M. stated that the votes for Jones were "11 to 1" on all charges; for Young, the vote was "11 to 1" on the murder and aggravated assault charges, and "8 to 4" on the gang-act charge; and, for McFarland, the vote was "6 to 6" on the murder charges, "7 to 5" on the aggravated assault, and "5 to 7" on the gang-act charge.[5]

The court then asked each juror two questions: (1) have all

___

[5] The dissent argues that L. M. was not a holdout juror because only eight of the thirteen charges were eleven to one. But L. M. was undisputedly the lone holdout as to those eight, including all of the charges against Jones. And more importantly, we are aware of no authority — and the dissent identifies none — for the proposition that a trial court has *broader* discretion to remove a juror simply because one or more other jurors may share that juror's position. Indeed, that another juror may share that juror's position may undermine the notion that the juror in question had refused to deliberate. See *Semega v. State*, 302 Ga. App. 879, 882 (1) (691 SE2d 923) (2010) ("that a second juror originally agreed with the replaced juror" indicated "that the juror had not refused to deliberate but had simply reached a different decision than that of the other jurors").

jurors deliberated, and (2) have there been any instances of insult, undue intimidation, or pressure?[6] All of the jurors affirmed that everyone had deliberated. Eight of the jurors, including L. M., responded that there had been no instances of insult, undue intimidation, or pressure; four jurors (J. S., C. G., C. R., and L. W.) answered that there had been such instances, although one added the caveat, "[n]ot to me." The trial court instructed these four jurors to make a written narrative of what they had seen and provide those writings to the court. The four written explanations stated as follows:

> Statement from J. S.: [L. M.] has not fairly deliberated during this trial. She has insulted others because of differing views. However, I know this is a part of the process — to discuss our different views. To expand on [the] insult, she has attacked (verbally) others on their views of the law. I do not think she was fit to be on a court case.

> Statement from C. G.: I felt threatened by [the] fore[person] by her singling me out and said she was about to snap on someone.

> Statement from C. R.: Witnessed the fore[person] refer to

---

[6] The trial court instructed each juror to answer these questions with a "yes" or "no."

11

a juror as "Dr. Phil." The fore[person] has stated she would not want any of us to ever be on a jury deciding her fate if ever a defendant. The fore[person] has stated she has made up her mind and she feels like we are trying to "change her mind." The fore[person] stated she has looked around the room and sees the others giving her bad looks.

Statement from L. W.: [L. M.] made a statement about how she was about to "go off" and she didn't want to have anyone come make arrests in here. She has also said we've been giving her disgusted looks and by her language is nonchalantly insulting several others based on their own interpretation of the evidence presented to all of us. She also has talked about her time in prison and I believe she was suspected of aggravated assault according to what I have heard from her.[7]

Once again, the parties had a lengthy discussion regarding the trial court's next steps. Ultimately, the court brought the four jurors and the foreperson back into the courtroom one at a time and questioned them regarding their experience deliberating.

The testimony of the four jurors included that L. M. was

---

[7] During a break, the prosecutor confirmed that L. M. was arrested for aggravated assault in 2008 and that the District Attorney's office indicted her on that charge, which was subsequently reduced to battery. The prosecutor argued that L. M.'s failure to disclose this arrest during voir dire showed that "she got on that jury with an agenda." A review of the voir dire transcript shows that the trial court asked the statutory question concerning whether anyone in the pool was a convicted felon who did not have his or her civil rights restored, but there do not appear to have been any questions concerning arrests or misdemeanor convictions.

defensive and combative in the jury room; had been insulting other members of the panel to the point that those persons would "refrain from being forthcoming in their opinions"; "was very obstinate," "not involved at all," and "wanted to call it quits" as soon as "midafternoon" on the first day of deliberations; "made up her mind" early in the deliberation process, but refused to explain her opinions or the reasoning behind them; had physically removed herself from the table and refused to participate in discussions; sat in the corner of the room and would not make eye contact with other jurors; and refused to consider or listen to the views of other jurors, deliberate with an open mind, or review all of the evidence presented at trial. Jurors testified that L. M.'s behavior was "disruptive to moving forward in [the] deliberation process" because, although it did not prevent them from considering the evidence and the law, it forced them to "operat[e as] an eleven member jury." L. W. clarified that L. M. was "[o]nly disruptive in the sense that in order to deliberate it must be every person on the jury to reach a unanimous decision, so only disruptive in that sense, not in a loud, demonstrative sense."

One juror testified that L. M. may not have voted:

> I didn't know that she had chosen not guilty on some of the ones that she read out today, when we were all here together? Because she keeps saying I don't know. I don't know. I don't know. So we couldn't really put it down as a not guilty or a guilty when we were taking the votes. And I'm not even sure I saw her hand go up on either of those votes as we re-tallied them again this morning.

But another juror explained that not-guilty votes were not asked for: "[W]e never did the opposite vote, and therefore the numbers that are not on that sheet of paper we gave to you were not necessarily votes for the opposing view, they were just not stated votes at this time."[8]

L. M. testified that she was participating in deliberations and that she was applying the law to the facts "to the best of [her] knowledge." When the trial court asked if there were disagreements

---

[8] The dissent argues that this indicates that L. M. refused to vote, and that her refusal to vote guilty or not guilty is another reason to have removed her. But again, the trial court made no such finding (finding instead that she made up her mind quickly, which is the opposite of refusing to decide). Moreover, this testimony was not undisputed; L. M. testified that she voted on every count. In context, the testimony on which the dissent relies is far from clear. And there does not appear to be any evidence to support the idea that L. M. had never voted; at most, the evidence supports the finding that the trial court actually made: that L. M. stopped engaging (which would include voting) at some point because she made up her mind.

between her and the other jurors about the law and the facts, she replied, "For me it's more emotional, it's a more emotional thing[,]" adding that "[w]e have people back there crying and all of that." She explained further:

> [B]efore we even just got into the box or whatever, it was already guilty, you know, and I'm — like I said in the note I wrote you, I said maybe I got a "mis-concept" of how the law is and how things work and all that. That's why I asked to be switched out, because how I — in my mind, how I got it, and how I look at things as the real evidence as far as the gun and all this — maybe I watch too much TV, I don't know, but in my mind, this is how it's set up. And that's what I explained to the other jurors. They had all these different people here with different minds, and it's, like I said, maybe I got a misunderstanding on how things work or — I'm not sure.

L. M. also was questioned by the trial court about her criminal history, responding that she had pleaded guilty to a misdemeanor simple battery charge and received a sentence of probation. She said that she did not recall any voir dire questions that called for a disclosure of this, saying she had never been convicted of a felony.

After the jurors returned to the jury room, the State moved the trial court to remove L. M. from the jury. The defendants objected.

15

The trial court took a recess to consider all of the arguments and testimony; during the break, L. M. sent another note to the trial court (at approximately 5:10 p.m.) that stated: "Judge, with all respect I am a residen[t] of Columbus, GA an[d] the way things just took place, I don't agree. I thought the jurors['] info [would] be private, I did not sign[ ] up for this, and to get [thrown] under the bus in front [of] the whole courtroom is a slap in the face."

After another recess, the trial court granted the State's motion to remove L. M. In a subsequent written order, the trial court found as follows:

> [L. M.] did not threaten the other jurors nor did she unduly pressure or intimidate them into changing their opinions. However, through those same testimonies, it was discovered that [L. M.] was impeding the jury's progress as a whole in deliberating. It was stated that as early as two hours into deliberations, L. M. announced that she had made up her mind and then removed herself from further discussions. According to fellow jurors, L. M. removed herself from the table and positioned herself in the corner of the room away from the other jurors, and she refused to communicate her reasons for her state of mind. She further stated that she would not deliberate any longer and asked to be removed from the jury. Multiple jurors stated that in order to proceed with deliberations, they had to act as if it was an 11[-] person jury, including

16

when it came to voting on guilt or innocence.

Before the trial court could inform the jury of its ruling, however, the court received another note from L. M., which stated: "We as [the] jury has [sic] come to a verdict. We are ready to deliberate." The defendants, once again, moved for a mistrial, which the court denied. The court brought the jury back into the courtroom and informed the jurors that the court would "not accept the verdict." Thereafter, the trial court removed L. M. from the panel and replaced her with an alternate juror. McFarland and Young moved again for a mistrial; Jones moved for a mistrial as well, and the trial court denied the motions.

Deliberations with the alternate juror proceeded over the course of three weekdays, although their commencement was delayed due to tornado warnings, then the jury lost at least half a day of deliberations due to the alternate juror experiencing a fall that sent her to the hospital. On the third day, the jury announced that it had reached unanimous verdicts, but during polling of the jury and subsequent individual questioning, the alternate juror

17

stated that her verdicts as to Young and McFarland were not freely and voluntarily made. The trial court charged the jury pursuant to *Allen v. United States*, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896), and later that day the jury returned verdicts of guilty on all counts as to all defendants, with the alternate juror affirming in polling that her verdicts were freely and voluntarily made.

(b)  A trial court generally has broad discretion to remove a juror for cause. But this discretion is narrowed once deliberations have begun, and even more so when removing a dissenting juror from a jury that appears to be divided.

The general rule on removing jurors for cause is statutory. OCGA § 15-12-172 provides:

> If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated.

As this Court has explained:

> The question of whether to remove a juror is a matter committed to the trial court's discretion, even after jury

18

deliberations have begun. However, there must be some sound basis upon which the trial court exercises his discretion to remove the juror. A sound basis may be one which serves the legally relevant purpose of preserving public respect for the integrity of the judicial process.

*Moon v. State*, 312 Ga. 31, 36-37 (2) (860 SE2d 519) (2021) (citation and punctuation omitted). "Both the need for investigation and the possibility of harmful error are heightened when a jury has begun deliberations or when a jury is deadlocked." Id. at 37 (2) (citation and punctuation omitted). And "because removing a dissenting juror when the jury is deadlocked risks violating a defendant's right to a unanimous verdict, a trial judge must exercise the utmost care in determining that good cause exists before removing the juror." Id. at 37 (2) (citing *Ramos v. Louisiana*, __ U. S. __ (140 SCt 1390, 1397, 206 LE2d 583) (2020); and *United States v. Brown*, 996 F3d 1171, 1184 (11th Cir. 2021) (en banc)).[9]

---

[9] The dissent cites our case law for the general proposition that a criminal defendant has no vested interest in the service of any particular juror. See *Reynolds v. State*, 271 Ga. 174, 175 (2) (517 SE2d 51) (1999) (affirming dismissal of juror after trial began but before deliberations when juror realized he was disqualified). But the dissent cites no case law that supports the application of this rule to remove a holdout juror during deliberations, and such an application would squarely conflict with *Moon* and other decisions of this Court.

19

Georgia appellate decisions reviewing the removal of jurors during deliberations reveal a general rule for the removal of holdout jurors during deliberations: such a juror may be removed after sufficient investigation supports findings establishing proper reasons unrelated to the juror's view of the trial evidence, but a juror may not be removed for reasons related to the juror's view of the trial evidence, even if the juror's insistence on that view has negative effects on other jurors and the jury's deliberations. Many cases have affirmed removal during deliberations for reasons unrelated to the juror's view of the trial evidence. See, e.g., *Jones v. State*, 307 Ga. 463, 465-466 (2) & n.5 (835 SE2d 620) (2019) (no abuse of discretion in removal of juror during deliberations where juror said she was unable to deliberate; "the trial court explicitly acknowledged that it would be inappropriate to release the juror at issue merely because she was a lone holdout"); *Allen v. State*, 297 Ga. 702, 704 (3) (777 SE2d 680) (2015) (no abuse of discretion in removal during deliberations where "removed juror (1) stated several times that she did not want to form an opinion about the case, and (2) further stated

20

that she was actually incapable of making the decision in the case because she could not 'play God' and because her moral beliefs precluded her from making a decision in the case"); *Moon v. State*, 288 Ga. 508, 513 (5) (705 SE2d 649) (2011) (no abuse of discretion in removal during deliberations where holdout juror "was not removed for refusing to deliberate but because of concerns over her truthfulness and impartiality as well as her extra-judicial comments"; evidence showed she knew defendants and many witnesses, but had not "let on during voir dire," and referred to one witness as a drug dealer even though no evidence of such was presented); *Carr v. State*, 282 Ga. 698, 702 (4) (653 SE2d 472) (2007) (no abuse of discretion in removal during deliberations when "juror did not promptly inform the court when it became clear that his voir dire representation that he did not know any of [defendant's] relatives was incorrect"); *State v. Arnold*, 280 Ga. 487, 487, 489-490 (629 SE2d 807) (2006) (no abuse of discretion in removal of juror where the juror "questioned the impartiality of the trial court and humiliated, insulted, and cursed at other jurors during

21

deliberations," including "actively humiliating other jurors through the use of vindictive personal attacks wholly unrelated to the important issues being considered by the jury");[10] *Williams v. State*, 272 Ga. 828, 830 (5) (537 SE2d 39) (2000) (no abuse of discretion in removal during deliberations of juror who "stated she could not deliberate because her religious beliefs prevented her from judging another person"); *Thompson v. State*, 260 Ga. App. 253, 257-260 (5) (581 SE2d 596) (2003) (no abuse of discretion in removal during deliberations of lone holdout juror and first alternate juror when trial court found the two engaged in effort to subvert jury, including by attempted bribery of third juror); *Alford v. State*, 244 Ga. App. 234, 238 (534 SE2d 103) (2000) (removal during deliberations not abuse of discretion when trial court removed juror "only after [juror] made it clear that he would not participate in any discussions with his fellow jurors and kept repeating that he wanted 'off' the jury," and juror "never stated that he believed the defendants were

---

[10] The dissent relies heavily on *Arnold*. But the trial court's findings here prevent any real similarity between L. M. and the juror in *Arnold*.

22

innocent but rather described problems dealing with his fellow jurors and participating in deliberations"); *Cloud v. State*, 235 Ga. App. 721, 721-722 (1) (510 SE2d 370) (1998) (no abuse of discretion in removal during deliberations when juror requested removal, cried, and said he could not judge the defendant, and the record provided "no support for [defendant's] contention that the juror was actually expressing his view of [defendant's] innocence"); *Norris v. State*, 230 Ga. App. 492, 495-496 (5) (496 SE2d 781) (1998) (no abuse of discretion in removal during deliberations where juror falsely denied during voir dire having been in abusive relationships, and during deliberations displayed bias arising from that history); *McGuire v. State*, 200 Ga. App. 509, 510 (3) (408 SE2d 506) (1991) (no abuse of discretion in removal during deliberations where juror visited crime scene in violation of judge's instructions and urged other jurors to vote based on juror's extrajudicial observations).

On the other hand, a number of Georgia appellate decisions have concluded that the trial court abused its discretion in removing a juror during deliberations when the removal was for a reason

related to a juror's view of the evidence, or when the trial court's investigation was insufficient to conclude with confidence that the reason for removal was unrelated to the juror's view of the evidence. In other words, a juror's view of the evidence is not the sort of "legally relevant purpose" our case law requires before removing that juror, even when the juror's view of the evidence has a negative effect on deliberations. See, e.g., *Moon*, 312 Ga. at 36-50 (2) (trial court abused discretion in removal of a holdout juror when all jurors made up their minds quickly and trial court's contemporaneous statements about the juror's misconduct were not supported by findings); *Mills v. State*, 308 Ga. 558, 559-563 (2) (842 SE2d 284) (2020) (trial court abused discretion in removal of holdout juror who said she would change her mind only if the State had a clear-resolution video of the crime; trial court found this constituted failure to follow instructions on burden of proof, but it was not); *Delgado v. State*, 356 Ga. App. 625, 629-630 (848 SE2d 665) (2020) (trial court abused discretion in removal of holdout juror who participated in deliberations for five hours before making up his

24

mind and disengaging from further deliberations); *Semega v. State*, 302 Ga. App. 879, 880-882 (1) (691 SE2d 923) (2010) (trial court abused discretion in removal of holdout juror about five hours into deliberations; foreperson testified juror would not consider all the evidence, but the juror testified he did consider all the evidence, and trial court should have investigated further before simply crediting foreperson); *Mason v. State*, 244 Ga. App. 247, 249 (1) (535 SE2d 497) (2000) (trial court abused discretion in removal of holdout juror who arrived at conclusion and, after two days of deliberations, refused to participate further and asked to be removed, going so far as to leave the jury room and wait in the courtroom); *Stokes v. State*, 204 Ga. App. 141, 142 (1) (418 SE2d 419) (1992) (trial court abused its discretion in removal of two jurors who refused to vote after 30 minutes of deliberations when the only evidence of why they refused was the foreperson's statement that they felt there was "not enough evidence either way," which indicated that "those two jurors either had reasonable doubt about [defendant's] guilt or were confused about the meaning of reasonable doubt," and court should have

either recharged the jury as to burden of proof and continued deliberations or declared a mistrial; removal of jurors "who may have harbored reasonable doubt" was "extraordinary").

In one sense, this case could perhaps have fit in either of these two lines of cases: while the evidence the trial court developed during its investigation could have supported findings that would place this case in the line allowing removal, the findings the trial court actually made instead placed it squarely in the line prohibiting removal. There was sufficient testimony from which the trial court could have found that L. M. insulted, threatened, unduly pressured, and intimidated other members of the jury, the sort of behavior unrelated to a juror's view of the evidence that we have held can justify removal; indeed, the State and the dissent rely in part on this point in defending L. M.'s removal. But the State and dissent fail to grapple with the fact that *the trial court made no such finding*. To the contrary, the trial court expressly found that L. M. "did not threaten the other jurors nor did she unduly pressure or intimidate them into changing their opinions," and made no finding at all about

26

insults.[11] Although some jurors reported that L. M. had threatened, insulted, or pressured them in some way, "[c]redibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact." *Tate v. State*, 264 Ga. 53, 56 (3) (440 SE2d 646) (1994). "The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony." Id. Because the trial court did not find that L. M. threatened or insulted others, we cannot affirm her removal on this basis.[12]

---

[11] The motion-for-new-trial judge concluded in his order denying the motion for new trial that the trial judge's statements in this regard "are also properly interpreted as a finding that the pressure and intimidation described by the four jurors did not cause any of them to change their opinions of the evidence" and "is not the same as saying that pressure and intimidation were not exerted[.]" But the trial court plainly found that L. M. had not threatened anyone.

[12] The dissent asserts that the trial court made implicit findings about L. M.'s behavior impeding deliberations, but does not explain how any findings were necessarily implicit in the court's written order, much less how we can read unnecessary implicit findings into the order containing explicit findings. Our general presumption that trial courts make permissible implicit findings that support their orders is a presumption that applies "in the absence of explicit factual and credibility findings by the trial court[.]" *Davis v. State*, 306 Ga. 430, 432 (831 SE2d 804) (2019). No such absence exists in this case. Moreover, the testimony by four jurors that L. M. insulted other members of the jury was disputed by L. M. and the other seven jurors, who all testified that no incidents of insult occurred. "[A]n appellate court generally must limit its

27

Instead, the trial court based its removal of L. M. on four related findings: (1) she ceased deliberating after making up her mind as early as two hours into deliberations, (2) she refused to communicate her reasons for her conclusion, (3) she sought to physically distance herself from the other members of the jury, and (4) she asked to be removed from the jury. Even assuming these findings are supported by the record,[13] they are insufficient to support removal. Each of these findings is part and parcel of the notion that L. M. reached a firm conclusion as to the counts before the jury and declined to deliberate further. Although the dissent makes much of the trial court's finding that L. M. was "impeding the jury's progress as a whole in deliberating," the court made no finding that L. M. prevented *other* jurors from deliberating, and the context

consideration of the disputed facts to those expressly found by the trial court." *Hughes v. State,* 296 Ga. 744, 746 (1) (770 SE2d 636) (2015).

The dissent also criticizes us for "seem[ing] to credit L. M.'s statements that she was participating in deliberations and considering the evidence[.]" Not so. Even the trial judge's findings indicated that L. M. had participated in deliberations for at least two hours: "It was stated that as early as two hours into deliberations, L. M. announced that she had made up her mind and then removed herself from further discussions."

[13] The basis for the trial court's finding that L. M. stopped deliberating after two hours is unclear.

of that finding strongly suggests that the court meant that L. M. was impeding deliberations in the sense that the jury was unable to reach a unanimous verdict given her unwillingness to participate in further discussions. We are not aware of any decision of this Court holding that a juror's having arrived at a firm conclusion based on the trial evidence — or arriving at that conclusion too quickly after deliberations begin — constitutes good cause for removal. Indeed, "once a juror has heard the evidence, the arguments of counsel, and the court's instructions on the law, there is no requirement that the juror spend any particular length of time deliberating before forming an opinion as to the defendant's guilt or innocence." *Moon*, 312 Ga. at 46 (2) (b) n.7.

With one possible exception, the limited case law on which the State relies does not support L. M.'s removal.[14] And, as explained

---

[14] The District Attorney makes a substantive argument about only two cases, *Bethea* and *Mayfield v. State*, 276 Ga. 324 (578 SE2d 438) (2003), citing a third case only for the applicable standard of review. The Attorney General cites no cases for anything other than generally applicable standards, but we interpret generously the parentheticals for two of those cases, *Mills* and *Jones*, as containing some kind of case-specific argument.

below, we expressly disapprove that one possible exception, *Bethea v. State*, 337 Ga. App. 217 (786 SE2d 891) (2016), to the extent that it could be read as inconsistent with the general rule we have found in Georgia case law.

In *Jones*, we concluded that the trial court acted within its discretion in removing a juror who asked to be removed, "repeatedly broke down" when questioned by the court, and told the court she was unable to continue to deliberate. 307 Ga. at 465-466 (2). But there was no indication in that opinion that the reason the juror felt that she was unable to continue was that she had reached a firm conclusion at odds with her fellow jurors. Indeed, we made clear in that case that "it would be inappropriate to release the juror at issue merely because she was a lone holdout" and noted the juror's unhappiness with another juror. Id. at 466 (2) n.5.

In *Mills*, we held that a trial court abused its discretion in removing a holdout juror who said that she would change her mind only if the State could present a clear-resolution video of the crime. See 308 Ga. at 559-563 (2). The trial court found that this

30

constituted failure to follow the court's instruction on the burden of proof, but we disagreed, in part due to an insufficient investigation. See id. Nothing in *Mills* supports the State's argument; the trial court here made no finding about any failure by L. M. to follow instructions.

In *Mayfield v. State*, 276 Ga. 324 (578 SE2d 438) (2003), we affirmed a trial court's decision to investigate and then give an *Allen* charge instead of to remove a juror or grant a mistrial; in that case, a note from the jury accused a juror of refusing to apply the law, and then later a juror threatened violence. See id. at 326-331 (2). Nothing in *Mayfield* supports the State's argument; the trial court in *Mayfield* did not remove a juror, and, in any event, the trial court here found that L. M. did not threaten anyone and did not find that she refused to follow the law.

Finally, the State cites *Bethea*, a Court of Appeals decision that affirmed the removal of a juror based in part on the trial court's conclusion that the juror had "reached a fixed and definite opinion" early in determinations, apparently after "fewer than two hours."

31

337 Ga. App. at 219-220. But we have cited that case only once, in a "Compare" cite that characterized the juror removed therein as having "formed an unwavering opinion before fully vetting the evidence[.]" *Moon*, 312 Ga. at 47 (2) (b). Our uncritical citation of *Bethea* in that fashion did not adopt all of its reasoning. And to the extent that *Bethea* holds that a juror's refusal to deliberate further once she has made up her mind after two hours of deliberations is good cause to remove her, we decline to adopt that holding now.

*Bethea* states generally that "[l]egal cause for excusing a juror arises when the court determines, in its sound discretion, that the juror holds an opinion so fixed and definite that he or she cannot lay it aside and decide the case on the evidence presented and the court's charge." 337 Ga. App. at 219 (citation and punctuation omitted). For that proposition and others, however, *Bethea* relies on Georgia appellate opinions involving questions about the removal of jurors *prior* to the start of deliberations. See id. at 219-220 nn. 6-9 & 11. "Because a juror's verdict must be based on the evidence in the case, a trial court may excuse for cause a *prospective* juror who has formed

32

a fixed opinion as to the defendant's guilt or innocence prior to hearing any evidence in a case." *Moon*, 312 Ga. at 46 (2) (b) n.7 (emphasis in original); see also *Edmonds v. State*, 275 Ga. 450, 453 (2) (569 SE2d 530) (2002) ("In order for a potential juror to be excused for cause, see OCGA § 15-12-164 (a), the person must be shown to hold an opinion of the guilt or innocence of the defendant that is so fixed and definite that the person will be unable to set the opinion aside and decide the case upon the evidence or the court's charge upon the evidence."); *Willis v. State*, 12 Ga. 444, 446 (1) (1853) ("The question then is, whether the formation and entertaining of a fixed opinion, either for or against the prisoner, will disqualify the Juror. We now rule for the first time that it will."); OCGA § 15-12-164 (providing that prospective jurors for felony trials must be asked during voir dire whether they have "formed and expressed any opinion in regard to the guilt or innocence of the accused" and that a juror's answer to that question may make the juror "incompetent" and subject to being set aside for cause).

This Court also has held that good cause to remove a selected

juror who has reached a "fixed and definite" opinion of guilt or innocence can be established after jury selection, before the start of deliberations. See *Butler v. State*, 290 Ga. 412, 417-418 (5) (721 SE2d 876) (2012). Indeed, a juror or prospective juror who holds a fixed opinion about guilt or innocence before the evidence is complete and the judge has charged the jury has necessarily arrived at that opinion improperly, because that opinion is necessarily based on something other than all the evidence and the judge's charge. But it makes no sense to extend that same proposition to a juror who has reached a fixed opinion *after* listening to all of the evidence and the judge's charge, and engaging in deliberations. Such a juror may have done precisely what we expect jurors to do — consider the law and evidence, and thereby reach a conclusion with a high level of personal confidence.

*Bethea* can be read in two different ways. First, it can be read consistent with Georgia law as affirming the removal of a juror who refused to decide the case based on the trial evidence. See 337 Ga. App. at 219-220 (noting trial court's concern that juror reached a

34

decision "without fully vetting the evidence with the other jurors," and stating that good cause for removing exists when "juror holds an opinion so fixed and definite that he or she cannot lay it aside and decide the case on the evidence presented and the court's charge" (citation and punctuation omitted)). But *Bethea* can also be read to conclude that a juror may be removed for deliberating for what the court deems an insufficient amount of time before arriving at a conclusion. See id. (citing as reasons for removal that "she had reached an unwavering opinion fewer than two hours into the deliberation," "very early on, the juror had ceased deliberating with the other members of the jury," and "the juror held a fixed and definite opinion so early in the process"). We expressly disapprove as inconsistent with Georgia law this second interpretation of *Bethea*.[15]

Georgia law does not require a juror who has properly reached a fixed opinion as to guilt or innocence to continue to deliberate

---

[15] The dissent agrees with this disapproval while still relying on *Bethea* as support for its conclusion. But only the now-disapproved reading of *Bethea* supports the dissent.

indefinitely in order to fulfill the juror's duty. See *Moon*, 312 Ga. at 46 (2) (b) n.7; *Delgado*, 356 Ga. App. at 629-630; *Semega*, 302 Ga. App. at 880-883 (1). At some point a juror who has reached and communicated a firm conclusion as to guilt or innocence may stop engaging with other jurors in deliberations.[16] Most people lack the fortitude to debate an issue with strangers indefinitely. That does not mean that they are "unable to perform [their] duty" within the meaning of OCGA § 15-12-172.[17]

And although the trial court also found that L. M. "asked to be removed from the jury," a point that has supported removal in several other Georgia cases, that request does not support removal

---

[16] If a juror has a fixed view immediately upon beginning deliberations, that might support a finding that the juror developed that view previously based on something other than the complete trial evidence and the law. But this is not such a case, and the trial court made no such finding.

[17] We also note that this Court has affirmed guilty verdicts reached in less than two hours in murder and other serious felony cases. See *Franklin v. State*, 303 Ga. 165 (810 SE2d 118) (2018) (affirming murder conviction on verdict reached after 90 minutes of deliberations); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979) (upholding murder conviction and death sentence where jury reached guilty verdict after 50 minutes and death penalty recommendation after 58 minutes); *Jones v. State*, 233 Ga. 662 (212 SE2d 832) (1975) (affirming rape convictions based on verdicts reached after 13 minutes of deliberations).

36

here. That request was made in a note sent to the court, and the

relevant text of the note made clear that the request was a result of

L. M.'s firm conclusion that the evidence was insufficient to convict:

> I'm not sure if I have a different understanding of the law
> or what. I honestly feel that they do have some evidence
> but not enough for me to say guilty. I'm not sure if I have
> a different concept of how things work or what[ ] my duty
> here is, I have been through the evidence[;] we have went
> over it. I'm not sure what y[']all want from me, only thing
> happening now is, I'm getting force[d] to follow what
> everyone else is saying. Can I be switch[ed] with [an]
> alternate so y[']all can get the answer you're looking for.
> I'm firm!

A juror cannot be removed from a jury based on his or her request

to be removed when that request is based on a "firm" conclusion that

the evidence is insufficient to convict. Compare *Smith v. State*, 266

Ga. 827, 829 (2) (470 SE2d 674) (1996) (affirming removal when

juror informed court she could not fulfill her duties as a juror

because she had to undergo emergency dental surgery); *Alford*, 244

Ga. App. at 238 (affirming removal when juror kept repeating that

he wanted to be removed and "never stated that he believed the

defendants were innocent but rather described problems dealing

37

with his fellow jurors and participating in deliberations"); and *Cloud*, 235 Ga. App. at 722 (1) (affirming removal when juror requested removal, cried, and said he could not judge the defendant, and the record provided "no support for [defendant's] contention that the juror was actually expressing his view of [defendant's] innocence"); with *Mason*, 244 Ga. App. at 247-250 (reversing removal when juror concluded defendant was not guilty, but requested to be removed because she needed to get back to her business and if she were required to continue deliberating, she "might change her vote to go along with the majority" even though "her opinion about the case would [not] change").

Because the trial court abused its discretion in removing L. M. from the jury, we conclude that Jones's and McFarland's convictions must be reversed. See *Moon*, 312 Ga. at 50 (2) (reversing convictions where trial court abused its discretion in removing juror during deliberations); *Mills*, 308 Ga. at 562-563 (2) ("Dismissal of a juror without any factual support or for a legally irrelevant reason is prejudicial." (citation and punctuation omitted)).

3. Although we conclude that Jones and McFarland are entitled to new trials based on the trial court's handling of the juror issue, we must consider McFarland's argument that the evidence was constitutionally insufficient to sustain his convictions, as retrial would be precluded were he correct on this point. We conclude that the evidence is constitutionally sufficient.

McFarland specifically argues that the evidence was constitutionally insufficient as to him under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), because the State failed to show that he was a party to the crimes. When evaluating the sufficiency of evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis omitted). Moreover, "criminal intent is a question for the jury, and it may be inferred from [the defendant's] conduct before, during, and after the commission of the crime." *Jones v. State*, 292 Ga. 656, 658 (1) (a) (740 SE2d 590) (2013). Also, "[w]hile

mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense." *Parks v. State*, 304 Ga. 313, 315 (1) (a) (818 SE2d 502) (2018) (citation and punctuation omitted).

Here, the State presented sufficient evidence that McFarland was a party to the crimes charged. The State provided evidence that McFarland belonged to a criminal street gang and that he had a motive to avenge the killing of a senior gang member. Cellphone evidence showed that McFarland was in contact with Jones and Young before and immediately after the crimes. It also placed him in the area of Peachtree Mall at the time of the crimes, which directly contradicted McFarland's statement to the police wherein he denied being present at the mall at the time of the shooting. The cellphone evidence showed him moving in the same direction as Jones and ending in the vicinity of an address Jones had texted to Young after the shooting. Finally, surveillance video showed Jones, Young, and a third man meet in the mall parking lot. The video then

showed the group approach Meredith together, Jones shoot Meredith, and the three flee the scene together after the shooting.

When viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient as a matter of constitutional due process to authorize a rational jury to find McFarland guilty beyond a reasonable doubt of the crimes charged based upon his being a party to the crimes. See OCGA §§ 16-2-20 (defining "party to a crime"); 16-5-1 (a) (defining "malice murder"); 16-15-3 (defining "criminal street gang" and "criminal gang activity").

*Judgment reversed. All the Justices concur, except McMillian, LaGrua, and Colvin, JJ., who concur in part and dissent in part.*

COLVIN, Justice, concurring in part and dissenting in part.

Because I agree with the majority opinion's conclusions that the evidence was sufficient to sustain McFarland's convictions, I concur in Division 3. However, because the record shows that the trial court had a sound legal basis for dismissing a juror who, single-handedly, ground the deliberative process to a halt, our standard of

41

review mandates a finding that the trial court did not abuse its discretion in this case. Accordingly, I respectfully dissent from Division 2 and from the judgment reached in the majority opinion.

In my mind, the majority opinion's analysis contains a fundamental flaw in that it characterizes L. M. as a "holdout" juror. As the majority opinion notes, when L. M. announced the vote tally, the jury was undecided on all of the charges related to McFarland and on one of the charges against Young. In other words, the jurors were undecided on five of the thirteen charges and they were attempting to continue deliberating, but L. M. removed herself from all discussions and became disruptive to the process, bringing deliberations to a halt. While a juror can maintain her "not guilty" stance based upon her view of the evidence and the law, she cannot impede the deliberation process from proceeding so that no decision can be reached. Further, during deliberations, jurors routinely return to charges in the indictment and continue to debate and change their minds. Consequently, a tentative vote of 11 guilty 1 not guilty can change as the jurors continue to review and discuss

42

the evidence relating to the charges not yet decided. I do not suggest, as the majority opinion represents, that the trial court had broader discretion to remove L. M. "simply because one or more other jurors may share that juror's position." Maj. Op. p. 218 n.5. In fact, the record would not support such a finding because all of the jurors, including L. M., testified that they did not take a complete vote tally because they only counted the "guilty" votes on each charge.[18] Instead, it shows that the jury had no decision whatsoever on five of the charges when L. M. decided to stop participating.

Turning to the removal issue, a "defendant in a criminal proceeding has no vested interest in the service of any particular juror, but is entitled only to a legal and impartial jury." *Reynolds v. State*, 271 Ga. 174, 175 (2) (517 SE2d 51) (1999).[19] Under Georgia

---

[18] The majority opinion notes that L. M. herself either refused to vote or stated, "I don't know" when the jury attempted to take votes on all of the charges.

[19] Contrary to the majority opinion's assertion, our decision in *Moon v. State*, 312 Ga. 31 (860 SE2d 519) (2021), does not stand for the proposition that a criminal defendant has a vested interest in the service of a particular juror. If this were true, then judges would never be able to exercise the discretion granted to them by the General Assembly to remove a juror during deliberations, because a criminal defendant would always have a vested

43

law, "[a] trial court is statutorily vested with the discretion to discharge a juror and seat an alternate juror at any time during the proceedings, as long as the trial court has a sound legal basis to do so." *Smith v. State*, 284 Ga. 17, 22 (4) (663 SE2d 142) (2008) (citing OCGA § 15-12-172).  See also *Green v. Zant*, 715 F2d 551, 555 (11th Cir. 1983) ("There must be some sound basis upon which the trial judge exercises his discretion to remove the juror." (citation and punctuation omitted)).  "A sound [legal] basis may be one which serves the legally relevant purpose of preserving public respect for the integrity of the judicial process." *Gibson v. State*, 290 Ga. 6, 10 (5) (717 SE2d 447) (2011) (citation and punctuation omitted).  A trial court's decision to remove a juror under OCGA § 15-12-172 is reviewed for an abuse of discretion, see *Cummings v. State*, 280 Ga. 831, 835 (6) (632 SE2d 152) (2006), and the court "has broad discretion to determine whether it is appropriate" to do so, *Smith v.*

---

interest in every juror on the panel.  Instead, *Moon* held that the trial court abused its discretion because its removal "inquiry fell short and resulted in dismissing [a juror] on a basis that was not legally sound." *Moon*, 312 Ga. at 45 (2) (b).

44

*State*, 298 Ga. 357, 360 (3) (782 SE2d 26) (2016). "[T]he trial court's determination in matters such as this is based on the demeanor and credibility of the juror in question, which are peculiarly in the trial court's province." *State v. Arnold*, 280 Ga. 487, 490 n.2 (629 SE2d 807) (2006).

Our case law is clear that a trial court abuses its discretion when a juror is dismissed "without any factual support or for a legally irrelevant reason." *Mills v. State*, 308 Ga. 558, 560 (2) (842 SE2d 284) (2020) (citation and punctuation omitted). Indeed, the cases relied upon by the majority for a finding of an abuse of discretion fall into one of these two categories. See *Moon v. State*, 312 Ga. 31, 45 (2) (b) (860 SE2d 519) (2021) (holding that the trial court's limited inquiry into a holdout juror's possible incapacity did not provide sufficient factual support to show that the juror's removal fell within a sound legal basis); *Mills*, 308 Ga. at 559-562 (2) (trial court abused its discretion for immediately removing a holdout juror without conducting any inquiry into the juror's alleged incapacity so as to provide a sufficient factual basis for her removal);

*Semega v. State*, 302 Ga. App. 879, 879-882 (1) (691 SE2d 923) (2010) ("Under the circumstances, further investigation would have been necessary to establish additional evidence of failure to deliberate or juror misconduct before resorting to the extraordinary step of replacing a juror with an alternate."). See also *Delgado v. State*, 356 Ga. App. 625, 629-630 (848 SE2d 665) (2020) (trial court abused its discretion by removing lone holdout juror without a sound legal basis as the juror "did not fail to fulfill his obligations as a juror, but rather had reached a decision, . . . after meaningfully deliberating and trying to reach a verdict"); *Mason v. State*, 244 Ga. App. 247, 249 (1) (535 SE2d 497) (2000) (no sound legal basis for juror removal where there "was no showing that the juror was unable to fulfill her duties," "the juror's statements that she did not want to deliberate further and would not change her vote did not amount to a refusal to deliberate," and the juror's concern "about getting back to her business . . . [did] not amount to a legal cause for dismissal"); *Stokes v. State*, 204 Ga. App. 141, 142 (1) (418 SE2d 419) (1992) (trial court abused its discretion in removing two jurors where "[t]here was no

46

showing that the jurors were in any way incapacitated or unable to fulfill their duties and no other legal cause was shown," and where the trial court failed to develop any factual basis to support the jurors' removal).

This is not a case where the trial court removed a juror without factual support. Compare *Moon*, supra; *Mills*, supra; *Semega*, supra; *Stokes*, supra. Instead, the trial court properly followed our case law by performing a comprehensive inquiry into the allegations of misconduct — he questioned the entire jury panel and then thoroughly questioned L. M. and the jurors who had alleged the misconduct, including asking jurors to make written accounts of the behavior they witnessed.[20] This investigation created extensive factual support for the trial court's ultimate decision to remove L. M., and the majority opinion concedes that there are ample facts in the record to support removal.

Despite this, the majority opinion narrowly reads the trial

---

[20] The inquiry itself spanned approximately 45 pages of the trial transcript.

court's order before concluding that the trial court abused its discretion by removing L. M. from the jury. But "[o]n appeal, the question is whether evidence supports the trial court's determination [for removing the juror]." *Butler v. State*, 290 Ga. 412, 417-418 (5) (721 SE2d 876) (2012) (citation and punctuation omitted). Indeed, the majority's conclusion that "this case could perhaps have fit in either of these two lines of cases," Maj. Op. p. 226, regarding juror removal requires that we affirm the decision to remove because of the deference we owe to the trial court.

Giving the trial court's credibility determinations and factual findings the proper deference, considering the totality of the circumstances as borne out by the court's extensive investigation, and reading the court's order as a whole, I must conclude that the trial court did not abuse its discretion when it removed L. M. from the jury for impeding the deliberative process. The record shows that L. M. refused to deliberate early on,[21] though the rest of the jury

---

[21] While there is a discrepancy between the trial court's order and the record as to whether L. M. stopped deliberating after "two hours" or after "a

48

was split on five of the thirteen charges; physically removed herself from conversing with the other jurors; refused to consider the views of others, explain her own opinions or views to the other members of the panel, or fully participate in the voting process; asked to be removed from the jury panel; insulted other jurors, causing a chilling effect in the jury room; was "disruptive to moving forward in [the] deliberation process" because, while her behavior did not prevent jurors from considering the evidence and the law, it forced them to "operat[e as] an eleven member jury"; and that her disagreements with other jurors were "emotional" rather than based on the law or the facts. Based on the foregoing, I conclude that the trial court conducted a thorough investigation into L. M.'s interference in the deliberative process and "developed a factual basis for its decision to remove [L. M.] for a legally relevant purpose." *Gibson*, 290 Ga. at 10 (5).

---

few hours," that discrepancy is not material to the trial court's ruling. What matters is L. M.'s refusal to continue deliberating while the rest of the jury was attempting to consider the evidence and the law and applying the same to all of the charges against all of the defendants.

Still, the majority opinion seems to credit L. M.'s statements that she was participating in deliberations and considering the evidence in order to conclude that the trial court abused its discretion by removing her. However, the trial court is not required to ignore the evidence from the other jurors that L. M. was not deliberating, nor does L. M.'s testimony "make the trial court's [implicit] credibility decision to strike" her erroneous. *Butler*, 290 Ga. at 418 (5). See *Cummings*, 280 Ga. at 834-835 (6) (trial court did not abuse its discretion in replacing a juror for good cause based on the "totality of the circumstances").[22] Moreover, "we owe substantial deference to the way in which the trial court resolved disputed questions of material fact." *Hughes v. State*, 296 Ga. 744, 750 (2) (770 SE2d 636) (2015). While we may also "take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact," id. at 746 (1) n.4, appellate courts cannot "make

---

[22] Further, neither Jones nor McFarland "contend[s] that the alternate juror who replaced [L. M.] was not qualified to serve." *Butler*, 290 Ga. at 418 (5) (citation and punctuation omitted).

alternative findings of fact that are contrary to those explicitly or implicitly made by the trial court where other evidence exists that supports the trial court's findings," *Mathenia v. Brumbelow*, 308 Ga. 714, 716 (1) n.3 (843 SE2d 582) (2020). By finding that the trial court abused its broad discretion in this case, the majority opinion ignores the substantial deference we owe to the trial court's explicit and implicit findings concerning disputes of material fact.

Further, I disagree with the majority opinion that the trial court did not have a sound legal basis to remove L. M. Though the majority opinion categorizes the trial court's findings as "part and parcel of the notion that L. M. reached a firm conclusion . . . and declined to deliberate further," Maj. Op. p. 227, the trial court's order broadly concluded that L. M. was "impeding the jury's progress as a whole in deliberating." Id. In order to narrowly interpret this broad finding of the trial court, the majority opinion concludes that "the context of that finding strongly suggests that the court meant that L. M. was impeding deliberations in the sense that the jury was unable to reach a unanimous verdict given her unwillingness to

51

participate in further discussions." Id. Yet the majority opinion's interpretation is belied by the record. Although it appears that other jurors had reached an initial consensus as to Jones, the trial court and the jury were considering the case as it applied to *all three defendants*. To that end, the record shows that the jury was deeply divided on all of the counts against McFarland and on the Gang Act charge as it applied to Young. Despite having no consensus on these charges, L. M. refused to continue deliberating. She, among other things, physically removed herself from discussions, would not make eye contact with any jurors, refused to cast a vote, and asked to be removed from the jury while there was still much work to be done. In other words, whether L. M. was preventing other jurors from deliberating is of no consequence, because, as the trial court found, she was subverting the deliberative process as a whole.

Both this Court and the Court of Appeals have recognized that removal of a juror who was inhibiting the deliberative process is a sound legal basis for removal because it "serves the legally relevant purpose of preserving public respect for the integrity of the judicial

process." *Arnold*, 280 Ga. at 489-490 (citation and punctuation omitted) (no abuse of discretion for removal of juror "who unduly disrupts and prevents the ongoing deliberative process"). See also *Bethea v. State*, 337 Ga. App. 217, 219-220 (786 SE2d 891) (2016) (to the extent that it holds that a trial court does not abuse its discretion for dismissing a juror who refuses to participate in deliberations);[23] *Thompson v. State*, 260 Ga. App. 253, 259 (5) (581 SE2d 596) (2003) (no abuse of discretion for removal of juror where the trial court's investigation revealed that the holdout juror "was connected to an ongoing attempt to subvert the jury" and that "the deliberative process of the jury was under attack"); *Alford v. State*, 244 Ga. App. 234, 236-237 (534 SE2d 103) (2000) (no abuse of discretion for removing juror where that juror was antagonistic to other jurors, refused to participate in discussions or explain his opinions, and "wanted off" the jury); *Jones v. State*, 307 Ga. 463, 466 (2) (835 SE2d 620) (2019) (no abuse of discretion for removal of juror who had

---

[23] I agree with the majority opinion's disapproval of *Bethea* to the extent that it improperly extended Georgia's "fixed and definite" case law to the removal of jurors after deliberations have begun. Maj. Op. at 228.

53

"stopped participating in deliberations").

Because removal of a juror for impeding the deliberative process provides a sound legal basis for removal, and because the trial court developed sufficient facts in the record to support its reasoning for removal, I must conclude that the trial court did not abuse its discretion by removing L. M. from the jury. Because I would affirm the decision of the trial court, I dissent as to Division 2 and in the judgment of the Court.[24]

I am authorized to state that Justice McMillian and Justice LaGrua join in this opinion concurring in part and dissenting in part.

---

[24] I also see no basis in the other enumerations of error raised by Jones and McFarland for reversal of the judgment in this case.

Decided June 22, 2022 — Reconsideration denied July 14, 2022.

Murder. Muscogee Superior Court. Before Judge Land.

*David Walker, Michael W. Tarleton*, for appellant (case no. S22A0069).

*Marie T. Pardue, T. Moffett Flournoy III*, for appellant (case no. S22A0380).

*Stacey S. Jackson, District Attorney, Frederick Lewis, Alonza Whitaker, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.